In re ASPEN LIMOUSINE SERVICE, INC., d/b/a Vans To Vail, Inc. and Vans To Breckenridge, Inc., Debtor.

COLORADO MOUNTAIN EXPRESS, INC., Appellant,

v.

ASPEN LIMOUSINE SERVICE, INC., Airport Shuttle Corporation, Appellees.

Civil Action No. 95–K–2798.

United States District Court, D. Colorado.

March 15, 1996.

---

**7.** *In re McRann*, Case No. 92–55548–JRG, Order filed November 5, 1993.

Glenn Merrick, Merrick & Nash, L.L.C., Denver, CO, Thomas F. Quinn, Frederick L. Coldwell, Jones & Keller, P.C., Denver, CO, for appellant Colorado Mountain Express, Inc.

Edward T. Ramey, Isaacson, Rosenbaum, Woods & Levy, Denver, CO, for appellee Airport Shuttle Corp.

Michael E. Katch, Harvey Sender, Bonnie A. Bell, Denver, CO, for appellee Aspen Limousine Service, Inc.

## MEMORANDUM OPINION AND ORDER ON APPEAL

KANE, Senior District Judge.

Airport shuttle operator Colorado Mountain Express (CME) appeals from a final order of the bankruptcy court confirming the joint Chapter 11 reorganization plan submitted by small business debtor Aspen Limousine Service (ALS) and Airport Shuttle Colorado (ASC). CME contends the bankruptcy court erroneously elevated speed over fairness in the way it conducted the confirmation proceedings under the new Bankruptcy Code provisions applicable to small business reorganizations. Specifically, CME argues the court erred in prohibiting CME from soliciting approval on an equally accelerated basis for a competing plan of reorganization pursuant to which ALS would be liquidated and CME, instead of ASC, would receive its assets. I affirm the order.

## I. FACTS AND PROCEDURAL HISTORY

### A. Background

For some time, debtor ALS was a principal carrier providing passenger transportation services between Denver's Stapleton Airport (and later, Denver International Airport (DIA)) and certain ski and recreation areas in Pitkin County, Colorado. ALS began suffering financial difficulties in 1994. It ceased providing service for a period, reinstituted it on a reduced basis, and then, in May 1995, filed for Chapter 11 bankruptcy protection. ALS's difficulties and reduced service presented an opportunity for CME, a carrier that had previously provided transportation services between Denver and points in nearby Eagle County, to expand into Pitkin County and compete directly with ALS. The move was the precursor to a fierce battle between the two competitors. Unwilling to confine their battle to the marketplace, ALS and CME are currently waging it in the bankruptcy courts, in civil lawsuits and in

proceedings before state and federal regulatory agencies.[1]

### B. *The Bankruptcy Proceedings*

ALS filed its voluntary petition under Chapter 11 of the Bankruptcy Code on May 5, 1995. *See* 11 U.S.C. § 1101 *et seq.* The disclosure and confirmation provisions of Chapter 11 therefore govern the reorganization process in this case.

The filing of a voluntary petition under Chapter 11 triggers a limited period of time during which only the debtor may file a proposed plan of reorganization. Generally, this exclusive period is for 120 days. 11 U.S.C. § 1121(b). In the case of the small business debtor who elects to proceed under the accelerated procedures of §§ 1121(e) and 1125(f), the exclusive period is 100 days. *Id.* § 1121(e).

On August 9, 1995, 96 days after ALS filed its voluntary petition, ALS and ASC submitted a Joint Plan of Reorganization. (R.Vol. I Tab 122.) Pursuant to the plan, the 100% interest in ALS owned by ALS President Robert Regulski, Secretary–Treasurer Gilmore and ALS Vice President/director Phillip Sullivan[2] would be canceled and issued to ASC in consideration for its payment of all funds necessary to consummate the plan. *Id.* All potential breach of fiduciary duty claims between ALS and BHP would be deemed settled and released, and together ALS and BHP would form a Litigation Trust to pursue causes of action against CME in the antitrust lawsuit No. 95–D–1185. *Id.*

On August 14, ALS filed its Notice of Election to Proceed as a Small Business under § 1121(e) and § 1125(f). (R.Vol. I Tab 129.) The bankruptcy court ordered a hearing on ALS's notice set for August 29, 1995. At the conclusion of that hearing, the court ordered ALS to file a final plan of reorganization and financial statement by September 1. ALS complied, filing its First Amended Joint Plan and First Amended Disclosure Statement on September 1. (R.Vol. I Tabs 146, 147.) On September 5, the bankruptcy court entered an order which, *inter alia*, (1) conditionally approved ALS's disclosure statement; (2) fixed September 25, 1995 as the last day for filing objections to the disclosure statement and acceptances/rejections of the plan; and (3) set the confirmation hearing date for October 10, 1995. (R.Vol. II Tab 148.)

CME filed a competing Liquidating Plan of Reorganization and Disclosure Statement based on its status as a creditor[3] that same day. (R.Vol. II Tabs 149 & 150.) CME's plan called for the liquidation of ALS and the transfer of ALS's assets to CME. (*Id.* Tab 149 at p. 13.) Simultaneously with the filing of its plan, CME filed a Motion for Forthwith Conditional Approval of Creditor's Disclosure Statement and Ballot. (*Id.* Tab 151.) The motion was set for hearing on September 13, 1995. (*Id.* Tab 158.)

ALS filed a written objection to CME's motion for forthwith conditional approval on September 7, arguing the imposition of a competing plan burden on a small business

---

1. In addition to their activities before the Colorado Public Utilities Commission and the Interstate Commerce Commission, the parties have initiated at least three lawsuits in this court. In *Aspen Limousine Serv., Inc. v. Colorado Mountain Express*, No. 95–K–1345 (filed May 26, 1995), ALS contends CME lacks regulatory authority to operate in Pitkin County and seeks a permanent injunction preventing CME from doing so. I denied ALS's motion for preliminary injunction in that case on June 21, 1995. 891 F.Supp. 1450 (D.Colo.1995). In *Colorado Mountain Express v. Ethridge, et al.*, No. 95–K–1730 (filed July 11, 1995), CME claims certain of Pitkin County's County Commissioners and airport officials conspired to deny it access to the Pitkin County Airport. I granted CME's motion for preliminary injunction in that case on August 4, 1995. In *Aspen Limousine Serv., Inc. v. Colorado Mountain Express*, No. 95–D–1185, multi-million dollar

antitrust and business tort claims are the order of the day. That suit is pending before Judge Daniel.

CME has also filed appeals from at least three other orders of the bankruptcy court. These appeals—Nos. 95–K–3235, 95–K–3236, and 96–K–119—challenge orders issued by the court on December 15 and December 20, 1995, which prohibited CME from participating in proceedings before the Public Utilities Commission in which ALS and ASC sought to consummate the transfer of stock to ASC and held CME in contempt of court.

2. These individuals, who act collectively and are identified by the acronym "BHP" in the plan, each owned ⅓ of the shares of ALS's stock.

3. CME's unsecured claim is for $48.

debtor who timely filed its plan under 11 U.S.C. § 1121(e) would be contrary to the purposes of the Bankruptcy Reform Act of 1994 and the small business election. (*Id.* Tab 156.) Gilmore, Sullivan and Regulski also objected to CME's motion for forthwith approval, arguing CME's disclosure was inadequate and its plan not confirmable. (*Id.* Tab 164.) In the meantime, objections to the ALS/ASC joint plan were being filed and modifications to the plan made. *See, e.g.,* ALS's Modification to First Am. Joint Plan of Reorganization (*Id.* Tab 162);[4] Trustee's Objection to the Adequacy of the Debtor's First Amended Disclosure Statement (R.Vol. II Tab 179);[5] Objection to ALS Plan as to Classification of Creditor Western Petroleum Co.[6] (*Id.* Tab 180).

The bankruptcy court issued a bench ruling on September 14 denying CME's motion for forthwith conditional approval without prejudice and on an "interim basis." (*Id.* Tab 167.) The court also stated that it "may, if appropriate," reconsider the motion at a hearing it then scheduled for September 26, *see id.,* for the continued consideration of (1) the status of the Chapter 11 proceedings; (2) the adequacy of CME's disclosure statement; and (3) CME's motion for forthwith conditional approval. (*Id.* Tab 168.) The court reserved the right to issue a published opinion on the order at a later date.

Despite the court's order denying CME's motion for forthwith approval, CME wrote creditors a letter discussing CME's plan. ALS viewed this as a solicitation in violation of the court's order, and on September 25, 1995, filed a motion for an order to show cause why CME should not be held in contempt. (*Id.* Tab 181.)

The bankruptcy court issued a written order explaining its September 14 decision to deny CME's motion for conditional approval on an interim basis. (R.Vol. II Tab 187.) This order analyzed the small business provi-

sions applicable in this case and addressed three issues critical to CME's appeal. While the court agreed a strict construction of the 100 day exclusive period in § 1121(e) was contrary to the language of § 1125(f) and the legislative history preceding its enactment, it rejected ALS's contention that CME's disclosure statement could not be approved "until and unless" its plan was not confirmed. Order at 3–4. Instead, the court found that §§ 1121(e) and 1125(f)—when read in context with old §§ 1121(a), (b) and (c)—permitted CME to file a competing plan of reorganization after the expiration of the 100 day period and to solicit ballots on the same expedited basis as ALS, but not without condition. *Id.* at 2–4. Given the "tone" or "tilt in the Code to give an honest and diligent debtor-in-possession a first opportunity" to get its plan confirmed and do so in a "cost effective" manner, *id.* at 2–3, the court determined not to approve CME's disclosure statement until it had "preview[ed] in a preliminary fashion the likelihood of the Debtor's Disclosure Statement approval and.... confirmation of Debtor's Plan." *Id.* at 5. Such a preview was to occur at the hearing scheduled for the next day, when all objections and ballots pertaining to the ALS/ASC joint plan would be in. *Id.*

The September 25 order emphasized the interim nature of the denial of CME's motion. While the court reserved the right to reaffirm its ruling at the September 26 hearing, it invited CME to submit for consideration any modifications of its statement it wished. The court stated it would consider any modified statement at a later hearing and might reconsider CME's motion for conditional approval if the ALS plan faltered. *Id.* Recognizing its decision "may appear to be a little inconsistent," the court explained that it was intended to give ALS "its opportunity to quickly get a timely filed plan confirmed in a cost efficient manner," but also

---

4. The modification provided Class 7 unsecured creditors with 100% of their allowed claims at 8% interest, payable in quarterly installments over three years. (R.Vol. II Tab 162.) The first amended plan provided such creditors with 75% of their claims at 6% interest, with the remainder to be paid from the proceeds of a litigation trust.

5. In its objection, the United States Trustee sought additional evidence of the joint plan's feasibility as well as additional information regarding the litigation trust, and administrative expense claims.

6. Western later withdrew its objection. (*See* Docket # 189.)

wanted to "give a serious and committed creditor [CME] an opportunity to get its plan timely confirmed if [ALS] falters, fails to get sufficient favorable votes, declines to proceed, or cannot get a plan timely confirmed." *Id.*[7]

CME also filed its objections to ALS's disclosure statement and first amended plan of reorganization on September 25. CME filed a Notice of Filing of Amended Plan and Disclosure Statement and Request for Forthwith Conditional Approval of Amended Disclosure Statement before the September 25 hearing. (R.Vol. II Tab 184.)[8] At the hearing, the bankruptcy court ordered the parties to file any comments or objections to CME's amended disclosure on or before October 2, 1995. (*See* Minutes, R.Vol. II Tab 186.) It also ordered ALS's motion regarding CME's alleged contempt set for hearing.[9]

Objections to CME's amended plan were filed on October 2, 1995 by Sullivan, Gilmore and Regulski (R.Vol. III Tab 193), the wage claimants' committee (*Id.* Tab 194), and ALS (Tab 195). The bankruptcy court considered these objections and in an order issued October 5, 1995, found ALS objections 2.b, e, f, g, h, k, l, m, n(1)(2)(3), 3.a, and d to be "valid and worthy of consideration by CME and, to a greater or lesser degree, should be dealt with and incorporated into CME's Second Amended Disclosure Statement Regarding its First Amended Liquidating Plan of Reorganization." (*Id.* Tab 204.) The other objections were rejected. The court ordered that CME was entitled to submit a second amended statement, and that if CME did so, the court would "expeditiously review" the statement, and "if appropriate," consider it "for approval, circulation and balloting," and "set[ ] a confirmation hearing, subject to [ALS's] pending Plan and Disclosure Statement." (*Id.*)

Pursuant to the bankruptcy court's order, ALS filed a document summarizing the voting on its plan of reorganization and a status report on the various objections to confirmation filed by the Colorado Department of Revenue and CME. (R.Vol. III Tab 200.) ALS filed a supplement to this status report before the confirmation hearing on October 10, 1995. (*Id.* Tab 217.)

At 8:30 on the morning of the October 10 hearing, CME filed a Motion for Allowance of Administrative Expense Claims. (R.Vol. III Tab 206.) The motion identified three administrative claims: (1) the $3.2 million in antitrust and business tort counterclaims pending in No. 95–D–1185; (2) $60,000 based on CME's "substantial contribution" to ALS's bankruptcy case under 11 U.S.C. § 503(b)(3)(D); and (3) a claim for damages "in an amount presently unknown" for other post-petition business torts. (*Id.*)

The confirmation hearing went forward as scheduled on October 10 and continued through the following day. During the proceedings held on October 10, the court disallowed CME's administrative expense claims for purposes of the confirmation hearing only, estimating them at zero. *See* Minutes of Proceedings (R.Vol. III Tab 218). The court also found ALS's disclosure statement adequate and approved it. (*Id.*)

Based on these and other rulings made by the court on October 10, ALS filed a Second Amended Joint Plan of Reorganization on October 11, 1995. (*Id.* Tab 220.) The second amended joint plan was considered at a hearing held October 13, 1995. On the condition that certain modifications to the joint plan be filed by October 23, 1995, the plan was confirmed from the bench. *See* Minutes of October 13 hearing (R.Vol. III Tab 221). The modifications were filed, and the bankruptcy court entered a written Order Confirming Second Amended Joint Plan of Reorganiza-

---

7. The court revisited each of these issues in a published opinion issued on October 25, 1995, *nunc pro tunc* to September 14, 1995, and published at 187 B.R. 989 (Bank.D.Colo.1995).

8. CME's First Amended Disclosure Statement and First Amended Liquidating Plan of Reorganization on September 28. (R.Vol. II Tabs 190–91.)

9. In an order not made part of the record on appeal, ALS's motion was set for hearing on December 6, 1995. (*See* Docket # 185.) The bankruptcy court found CME in contempt, and the matter is on appeal. *See supra*, n. 1.

tion of ALS and ASC as Modified on October 24, 1995. (*Id.* Tab 237.)

CME filed its Notice of Appeal on November 2, 1995, and sought relief from the automatic stay to participate in proceedings before the Public Utilities Commission on the joint application of BHP (Messrs. Regulski, Gilmore and Sullivan) and ASC for the transfer of the ALS stock. The bankruptcy court denied CME's request, ordering it to "forthwith withdraw its protest/interventions before the Colorado Public Utilities Commission." *See* Findings of Fact and Conclusions of Law (Dec. 15, 1995) (Docket No. 352). CME's appeals from the bankruptcy court's December 15 order have been assigned Civil Action Nos. 95–K–3235 and 95–K–3236.

On December 22, 1995, CME filed a Motion for Stay Pending Appeal with the bankruptcy court. When the bankruptcy court failed to act on the motion by December 28, CME filed a Motion for Stay with this court. Because speedy implementation of the reorganization would moot CME's appeal, the motion was granted. I now address the issues on this appeal from the October 24 order confirming ALS's Second Amended Joint Plan of Reorganization, as amended.

## II. *ISSUES ON APPEAL*

CME presents four issues for appeal. CME contends the bankruptcy court erred (1) in frustrating competitive bidding for ALS by refusing to act upon the adequacy of CME's disclosure statement; (2) in approving, on a final basis, the adequacy of ALS's disclosure statement; (3) in estimating CME's Administrative Claim at $0 for the purposes of confirmation; and (4) in confirming the ALS/ASC Second Amended Joint Plan of Reorganization as Modified.

## III. *STANDARD OF APPELLATE REVIEW*

■ The bankruptcy court's findings of fact are subject to the clearly erroneous standard of review. Bank.R. 8013. Its legal conclusions are subject to *de novo* review. *Phillips v. White (In re White),* 25 F.3d 931, 933 (10th Cir.1994).

## IV. *DISCUSSION*

### A. *Refusal to Consider Competing Plan*

■ CME's assertion that the bankruptcy erred in frustrating competitive bidding for ALS by "refusing to act upon the adequacy of [CME's] disclosure statement" is unpersuasive. It is clear from the record that the bankruptcy court did act upon the adequacy of CME's disclosure statement: It reviewed the various objections to CME's statement; identified those it found had merit; and invited CME to address the objections in an amended statement which it would hear "subject to [ALS's] pending Plan and Disclosure Statement." *See* Order dated October 5 (R.Vol. III Tab 204.) CME's real complaint is that the bankruptcy court did not afford CME's plan the same liberal and expedited treatment to which a small business debtor's plan is entitled under the 1994 Bankruptcy Reform Act.

■ In this case of first impression, the bankruptcy court interpreted new statutory language applicable to small business reorganizations and determined that, while a creditor may file and solicit approval for a competing plan under 11 U.S.C. § 1121(e) after the expiration of the 100 day exclusive period, there is no unqualified, unlimited right to do so on the same accelerated track afforded debtor's plan. *See In re Aspen Limousine,* 187 B.R. 989, 991 (Bankr.D.Colo.1995). The court recognized the purpose underlying the 1994 Bankruptcy Reform Act was to make the reorganization process for the small business debtor "more expeditious, less complex and less expensive." *Id.* at 993–94 (citing 5 Collier on Bankruptcy, ¶ 1121.05 (15th ed. 1995)). Looking to the legislative history of the Act, the court noted Congress's intent in enacting §§ 1121(e) and 1125(f) was to subject the small business debtor "to more liberal provisions for disclosure and solicitation of acceptances for a proposed reorganization plan." *Id.* at n. 10 (citing H.Rep. No. 103–835, 103d Cong., 2d Sess. at 50 and 140 Cong.Rec. No. 142, H10, 768 (daily ed. Oct. 4, 1994)). Finding the debtor the primary beneficiary of the 1994 amendments, the court rejected CME's argument that, after the expiration of the 100–day exclusive period, its

competing plan was entitled to the same treatment.

I agree with the bankruptcy court's analysis. Section 1121(e) should not be read in a vacuum. Under CME's reasoning, the liberalized proceedings intended to facilitate and accelerate the small business debtor's ability to obtain a fresh start vis a vis other debtors would have the opposite effect once a competing plan of reorganization is filed. For example, the diligent small business debtor who files a plan within the 100–day exclusive period would have no opportunity after that period expired to obtain acceptance of its plan without also having to fight the advances of its competitor. Under § 1121(c), by contrast, a debtor who files its plan within the exclusive period has an additional 60 days' exclusive period in which to obtain acceptance unfettered by a competing plan or plans. CME's reading of § 1121 compels the small business debtor not only to face a competing plan earlier than its non-small business counterpart, but to face a plan that is proceeding on the same liberalized and accelerated basis intended by Congress to benefit the small business debtor. I agree with the bankruptcy court's interpretation of §§ 1121(b), (c) and (e), and find no abuse of discretion in the way the court conducted the proceedings with respect to CME's disclosure statement and competing reorganization plan.

CME contends the bankruptcy court's conduct "stripped the ALS creditors of their statutory right under Section 1129(c) to chose [sic] between competing plans." Opening Br. at 8. This argument is specious. The creditors' right to choose under § 1129(c) is triggered only when the requirements of § 1129(a) and (b) "are met with respect to more than one plan." CME's plan never got to that stage. Again, CME's complaint is with the bankruptcy court's decision to give ALS a "first opportunity" to get its plan confirmed and to deny, on an interim basis, CME's motion for forthwith conditional approval of its disclosure statement. As set forth above, that course of action was within the court's discretion to take under a proper interpretation of § 1121(e).

I conclude the bankruptcy court balanced properly the competing objectives under Chapter 11 of enabling a diligent debtor to gain a fresh start while at the same time encouraging competitive bidding for the equity of a reorganized debtor.

### B. The Adequacy of ALS's Amended Disclosure Statement

The bankruptcy court concluded there were no "basic flaws or missing information" in the Amended Disclosure Statement, and ruled it contained "essential and adequate information to enable the creditors and interest holders to make a knowing and sensible decision." Order Confirming Second Am. Joint Plan of Reorganization of ALS and ASC as Modified (R.Vol. II Tab 237) at ¶ 1. The court found the statement did not have to discuss the elements or the existence of CME's competing plan. Nor did it require further amendment to disclose any modifications or amendments to the plan made between the time of conditional approval and the confirmation hearing because such changes "were advantageous to and not adverse to any class of creditors." *Id.*

CME contends the bankruptcy court erred in approving ALS's Amended Disclosure Statement because at the time it was approved for transmittal to creditors, it was "materially false and misleading" in two respects: (1) it failed to disclose the existence of the "more attractive" competing CME Plan, and suggested the only alternative to the ALS/ASC joint plan was "catastrophic liquidation"; and (2) it materially understated the consideration being paid to Regulski, Gilmore and Sullivan for their cooperation. CME Opening Br. at 9, Reply at 2. These failures, CME argues, rendered the statement inadequate under § 1125(a) and (f) and the standards set forth in *In re Stanley Hotel,* 13 B.R. 926 (Bankr.D.Colo.1981). *Id.*

Section 1125(f)(2) provides that acceptances and rejections of a plan may be solicited based on a conditionally approved disclosure statement as long as the debtor provides "adequate information" to each holder of a claim or interest that is solicited. "Adequate information" is defined in § 1125(a) as

information of a kind, and in sufficient detail, as far as is reasonably practicable . . ., that would enable a hypothetical reasonable investor . . . to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan.

11 U.S.C. § 1125(a)(1).

■ The determination of what is "adequate information" in a disclosure statement is a practical and variable inquiry made on a case-by-case basis. *In re Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir.1988); *In re Stanley Hotel*, 13 B.R. at 930; *see generally*, 5 Collier on Bankruptcy ¶ 1125.03[1] (15th ed. 1995). Beyond the statutory guidelines described in § 1125(a)(1), the decision to approve or reject a disclosure statement is within the discretion of the bankruptcy court. *In re Stanley* at 930. Based on my review of the statement and the record on appeal, I find no abuse of discretion in the bankruptcy court's decision in this case to approve ALS's Amended Disclosure Statement.

### 1. *Failure to Disclose Competing Plan*

■ At the time ALS filed its Amended Disclosure Statement on September 1, 1995, CME's Plan and Disclosure Statement were not of record. CME concedes this point, but argues its plan was of record by the time the statement was conditionally approved such that approval was error. I disagree.

As an initial matter, § 1125(a)(a) specifically provides that "adequate information need not include such information about any other . . . proposed plan." This clause was added

10. That CME's plan truly was "more favorable" is disputed. The ALS/ASC Amended Joint Plan provided for 100% payment of claims. CME's plan also provided for 100% payment, but at a faster pace. CME's opinion that its plan was otherwise "more favorable" and "less risky" was speculative, and several objections to CME's plan had been filed. A number of the objections were deemed valid, and CME was asked to amend its statement to address them. *See* Order (October 5, 1995) (R.Vol. III Tab 204).

11. I note that if, as the record suggests, CME sent the claimant classes in this case a letter informing them of the existence of its competing plan during the week following the September 14

by the Bankruptcy Amendments and Federal Judgeship Act of 1984. Pub.L. No. 98–353, Title III, § 509(a), 98th Cong., 2d Sess. (1984), *discussed in* Collier, *supra*, ¶ 1125.03[1] at 1125–26. The amendment supports those cases in which it was held that a disclosure statement does not have to disclose the existence of other plans or the terms of such plans. *See id.*, (citing *In re Brandon Mill Farms, Ltd.*, 37 B.R. 190 (Bankr.N.D.Ga.1984) and *In re Civitella*, 14 B.R. 151 (Bankr.E.D.Pa.1981)).

■ The purpose of a disclosure statement is to inform equity holders and claimants about the probable financial results of the acceptance or rejection of that particular plan. *In re Stanley Hotel*, 13 B.R. at 929. It is intended to assist the creditors in evaluating the plan on its face, rather than to promote a comparison among various proposed plans. *In re Brandon Mill*, 37 B.R. at 192; *see Kirk v. Texaco, Inc.*, 82 B.R. 678, 684 (Bankr.S.D.N.Y.1988). A blanket rule requiring debtors to disclose the fact that a competing plan has been proposed might cause creditors to refrain from voting affirmatively on the debtor's initial proposal due to an expectation that the competing proposal will offer more favorable treatment of their claims.[10] *Ibid.* This type of delay in the administration of a bankruptcy case, particularly one involving a small business debtor proceeding under the accelerated process prescribed by §§ 1121(e) and 1125(f), should not be encouraged. *See id.*[11]

I conclude the bankruptcy court did not err in failing to require ALS to disclose the existence of CME's competing reorganization plan.[12]

hearing, then many, if not all, knew of CME's plan before they cast their votes in favor of ALS's plan. Only CME objected to the ALS/ASC joint plan.

12. I reject out of hand CME's contention for the first time on appeal that the confirmation order should be revoked because ALS's failure to disclose the CME plan was tantamount to fraud. *See* CME Opening Br. at 9–10, Reply at 3 (citing *In re Tenn–Fla Partners*, 170 B.R. 946 (Bankr. W.D.Tenn.1994)). Section 1144 provides for the revocation of an order of confirmation upon request filed by a party in interest within 180 days of the order's entry, and after notice and a hearing "if and only if" it is shown that such an

### 2. Disclosures Regarding the Settlement Reached with Regulski, Gilmore and Sullivan

■ Under the ALS/ASC joint plan, all avoidance and state law breach of fiduciary duty claims against ALS insiders Regulski, Gilmore and Sullivan (BHP) were to be released. CME contends that ALS's Amended Disclosure Statement was inadequate in its description of the proposed settlement with BHP by understating prepetition payments to BHP by $500,000 and by failing to place any value on these claims in the liquidation analysis. The bankruptcy court considered these arguments at the confirmation hearing and rejected them, finding "[t]he payments to the insiders and the possible claims against them have been adequately disclosed." Confirmation Order (R.Vol. III Tab 237) at ¶ 1.

■ It is not necessary to the adequate information standard that a disclosure statement specifically speculate as to future uncertainties such as the consequences of various possible outcomes of pending, let alone hypothetical, litigation. See In re Stanley Hotel, 13 B.R. at 935. The ALS/ASC plan at issue informed claim holders of the fact of settlement and the release of potential claims against BHP. Disclosure of the precise value of those claims or of the BHP settlement was not required, particularly where the ALS/ASC plan does not rely on recovery actions to fund the 100% payment to creditors.

I conclude the bankruptcy court did not abuse its discretion in finding ALS's disclosure statement adequate with respect to the BHP settlement.

### C. CME's Administrative Claims

CME asserts the bankruptcy court prescribed a "patently superficial and inadequate" process for estimating its administrative expense claims under 11 U.S.C. § 502(c), and therefore erroneously valued those claims at $0. I do not in the first instance believe CME's $3.2 million antitrust claim qualifies as an "administrative expense."

"order was procured by fraud." Such a request must be filed as an adversary proceeding. See

Even if it did, however, I find the bankruptcy court did not abuse its discretionary authority to estimate the value of CME's claims.

CME filed its Motion for Allowance of Administrative Expense Claims on the morning of the October 10, 1995 confirmation hearing. CME sought over $3,260,000 in administrative expenses based on the following claims: (1) antitrust and business tort claims based on ALS's allegedly anticompetitive post-petition conduct valued at $3.2 million; (2) a claim for "actual, necessary expenses incurred by CME, a creditor, in making a substantial contribution in this Chapter 11 case" valued at $60,000; and (3) an unspecified "claim for damages, in an amount presently unknown," for other post-petition misconduct "comprising disparagement and other business torts." Motion for Allowance (R.Vol. III Tab 206) at 1–2.

CME provided no factual or legal support for its claims and made no attempt to itemize its damages. It simply requested an order of allowance for "(i) damages in an amount to be determined in [Aspen Limousine v. Colorado Mountain Express, No. 95–D–1185]; (ii) damages for disparagement and other post-petition business torts by the Debtor in an amount to be proven; [and] (iii) making a substantial contribution as a creditor under 11 U.S.C. § 503(b)(3)(D)." Mot. Allowance at 2.

Rather than continuing the confirmation hearing, the court addressed the motion as one of several threshold issues to be taken up before the question of plan feasibility. See Tr. of Oct. 10, 1995 Confirmation Hr'g (R.Vol. VI) at 135–36. The court indicated it would take a "preview look" at CME's administrative expense claims, hearing the representations of the parties and taking offers of proof. Id. at 135. It emphasized consideration would be for the limited purpose of determining whether CME's antitrust claim "qualifie[d] as an administrative claim" and, then, for claim estimation under 11 U.S.C. § 502(c). Id. at 136. "The issue on the merits," it stated, "[would] be decided dispos-

B.R. 7001(5).

itively at a later time in another forum." *Id.* at 149.

For its offer of proof, CME tendered a copy of its Answer and Counterclaim filed in No. 95–D–1185. CME claimed the evidence to be presented at trial in that case would show that ALS approached customers and potential customers of CME and advised them that engaging in business with CME would be unlawful and that doing so would subject them to civil litigation and damages. Tr. (R.Vol. VI) at 138–39. It would also show that ALS's representatives told Pitkin County Airport officials to deny CME counter space at the airport for the purpose of eliminating or curtailing CME's ability to compete in Pitkin County. *Id.* at 139–40. Based on the evidence at trial, CME maintained it would be awarded treble damages under the antitrust laws in the amount of $3.2 million. *Id.*

With respect to its $60,000 substantial contribution claim under § 503(b)(3)(D), CME stated it would prove its role as a competitive force in the reorganization process drove the purchase offer for BHP's stock up significantly, to the benefit of the creditors. *Id.* at 141. The $60,000 sought reflected the costs, expenses and legal fees CME claimed it incurred in making that contribution. CME made no offer of proof with respect to the third category of administrative claims.

The bankruptcy court disallowed both the antitrust and contribution claims as administrative expenses for the purpose of confirmation, estimating them at $0. It found the latter barred under *In re Lister,* 846 F.2d 55, 57 (10th Cir.1988), where the Tenth Circuit held that efforts undertaken by a creditor solely to further his own self-interest will not be compensable under § 503(b)(3)(D) notwithstanding any "incidental benefit accruing to the bankruptcy estate." *See* Confirmation Order (R.Vol. III Tab 237) at ¶ 3; Tr. Octo-

ber 10 Hr'g (R.Vol. VI) at 151. It disallowed the former as being "too weak and insubstantial" to permit speculation as to its value for confirmation purposes. *See* Confirmation Order (R.Vol. III Tab 237) at ¶ 3; Tr. (R.Vol. VI) at 151.[13]

### 1. *The contribution claim.*

■■■■■ I agree the attorney fees and costs incurred by CME in pursuing its competing plan do not qualify as "administrative expenses" under § 503(b)(3)(D). The purpose of § 503(b) is to enable individual creditors, indenture trustees, equity security holders, unofficial committees, and custodians to recover costs and expenses for professional services of attorneys and accountants "which were reasonably incurred in aid of the administration of the estate and which inured to the benefit of the estate." *In re Jensen–Farley Pictures, Inc.,* 47 B.R. 557, 589 (Bankr.D.Utah 1985). CME was acting in its own interest in objecting to the ALS/ASC plan and furthering its competing plan. The attorney fees and expenses incurred in doing so should therefore be paid by CME, notwithstanding the incidental effect of this activity in increasing the value of the estate. *In re Lister,* 846 F.2d at 57 (citing *Jensen–Farley,* 47 B.R. at 565–69, 571).

### 2. *The $3.2 million antitrust claim.*

■■■ CME asserts its $3.2 million antitrust counterclaim in Civil Action No. 95–D–1185 is an administrative expense that should have been given a value and considered in any confirmation of the ALS/ASC plan. I am unpersuaded.

Allowable administrative expenses under § 503(b) "includ[e] ... (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." The Supreme Court has held that tort claims arising dur-

---

**13.** The court also found the antitrust claim "problematic" in that it was filed on the morning of the confirmation hearing by ALS's primary competitor and the proponent of a competing plan. Confirmation Order at ¶ 3. The court realized that if it failed to estimate the claim's value, CME's motion by its terms might defeat any possibility of confirmation. *Id.* Yet the nature of the claim, together with the fact that the lawsuit upon which it was based had only recently been filed in federal court, meant estimation would require speculating as to the outcome of a complex antitrust case in which the facts had not even been developed. "It would take an enormous leap of faith and violate notions of simple fairness," the court concluded, "to allow [the antitrust] claim at this time." Confirmation Order at ¶ 3.

ing a reorganization period may be "actual and necessary" expenses of the reorganization and therefore entitled to the priority status of administrative expenses. *See Reading Co. v. Brown,* 391 U.S. 471, 483–85, 88 S.Ct. 1759, 1765–67, 20 L.Ed.2d 751 (1968) (fixed amount fire damage resulting from the negligence of the receiver deemed "actual and necessary" expense of reorganization).

Several courts have applied *Reading* broadly, treating post-petition claims for damages as administrative expenses without considering whether they were "actual and necessary" to the administration of the estate or of its reorganization, or whether they were more properly viewed as general creditor claims. *See, e.g., In re MacDonald,* 128 B.R. 161, 164 (Bankr.W.D.Tex.1991); *In re Dennis Ponte, Inc.,* 61 B.R. 296, 299 (9th Cir. BAP 1986). *C.f. In re Chicago Pacific Corp.,* 773 F.2d 909, 914 (7th Cir.1985) (weighing whether to treat claim as priority administrative expense or general creditor claim). The value of unliquidated or contingent post-petition tort claims, they reason, must be estimated before any hearing on the confirmation of a plan. *See MacDonald* at 164. "This is so because any finding of feasibility that failed to take into account the possibility of the allowance of the administrative claim that [may] have to be paid in full would be clearly erroneous." *Id.* (citing *Pizza of Hawaii, Inc. v. Shakey's, Inc.,* 761 F.2d 1374, 1382 (9th Cir.1985)).

 In this circuit, however, the statutory priority given administrative claims under § 503 "[is] to be narrowly construed." *In re Amarex,* 853 F.2d 1526, 1530 (10th Cir.1988) (unless a § 503(b)(1)(A) claimant's interest is beneficial to rather than competitive with the interests of the creditors in a bankruptcy proceeding, it is not entitled to the priority of an administrative expense). *See, e.g., In re Lister,* 846 F.2d 55 (disallowing creditor contribution claim based on efforts to freeze debtor's assets during reorganization); *In re Consolidated Oil & Gas, Inc.,* 110 B.R. 535 (Bankr.D.Colo.1990) (former officers' claims for indemnification of attorney fees incurred in defending against post-petition mismanagement not entitled to administrative expense priority). Expenses must be direct and necessary costs of managing or administering the estate to be given priority under § 503(b)(1)(A). *See In re Pacesetter Designs, Inc.,* 114 B.R. 731, 734–35 (Bankr. D.Colo.1990) (allowing certain medical expenses incurred as a result of injury sustained while employed by debtor-in-possession, but disallowing other expenses as "too strained" and "too disparate with the language and intent of the Bankruptcy Code" to be considered a cost of administration).

It seems unlikely based on this authority that the Tenth Circuit would follow the Western District of Texas' approach in *In re MacDonald* and view ALS's contingent liability for $3.2 million in antitrust damages as a priority administrative expense. Unlike the fire-related damages in *Reading,* which were fixed and directly related to the receiver's negligence in preserving the property of the estate during the railroad's reorganization period, the $3.2 million in antitrust damages sought by CME is speculative as to amount and unrelated to the preservation of the estate.

### 3. *Estimation.*

Assuming, for the sake of argument, that CME's post-petition antitrust claims could be viewed as a priority administrative expense, I consider whether the bankruptcy court abused its discretion by the manner in which it estimated their value.

 If the court determines that the liquidation of a claim would unduly delay the administration of a bankruptcy case, it must estimate the claim's value for purpose of allowance. 11 U.S.C. § 502(c). In estimating a claim, the bankruptcy court should use whatever method is best suited to the particular circumstances. 3 Collier on Bankruptcy, *supra,* ¶ 502.03 at 502–76—502–77 (15th ed. 1995) (citing *Bittner v. Borne Chem. Co.,* 691 F.2d 134, 135 (3d Cir.1982)). Although the court is bound by the legal rules governing the ultimate value of the claim, there are no other limitations on the court's authority to estimate claims. *Id.* The method chosen will be reversed only for an abuse of discretion. *Id.; Bittner* at 135.

CME contends the bankruptcy court abused its discretion in refusing to continue

the confirmation hearing and by limiting CME's opportunity to be heard on its claims to a ten minute offer of proof. CME also takes issue with the court's concern over the "late-filing" of its motion, arguing there was no bar date for filing administrative claims and that ALS was "not prejudiced by surprise" because it had been served with the counterclaims forming the basis for CME's motion "months prior." CME Reply Br. at 6. Under the particular facts and circumstances of this case, I reject both contentions.

### a. Was the method used an abuse of discretion?

■ While I have grave reservations generally about the use of offers of proof in Chapter 11 proceedings requiring notice and a hearing,[14] the bankruptcy court's reliance on them in this case was not an abuse of discretion.

■ Allowing parties to be heard through offers of proof, under certain circumstances, may be appropriate "so long as the court is assuming the truth of what is offered and not attempting to resolve issues on conflicting offers of proof." *Drislor Assoc. v. Metro North State Bank*, 110 B.R. 937, 940 (D.Colo. 1990) (use appropriate in determining whether to grant relief from stay pending appeal). The record here reveals that the bankruptcy court did assume the truth of what CME offered, but concluded the offer, even if true, provided an insufficient basis upon which to value CME's claim.

■ Although CME implies the bankruptcy court deprived it of due process by failing to require an evidentiary hearing, it does not develop this argument or cite any

authority to support it. Nor does CME suggest the form the evidentiary hearing should have taken, or how such a hearing would have resulted in a valuation of its claim greater than $0. *See Bittner*, 691 F.2d at 136.[15] CME's silence indicates it could not do so. The antitrust action upon which the $3.2 million administrative expense claim was based is in its nascence; the facts forming the basis of CME's claim for damages simply have not been developed.[16] I reject in the strongest terms the assertion implicit in CME's arguments that confirmation of the ALS/ASC plan should have been postponed until the antitrust lawsuit ran its course. Chapter 11 proceedings may not be held hostage by the filing of claims so vague and unsupported that their estimation and liquidation become one and the same process.

■ Finally, the timing of CME's motion, together with the fact that confirmation of the ALS/ASC plan would doom CME's efforts to liquidate ALS and take over its assets through the approval of its competing plan, detract from the arguments on appeal. The motion was untimely and CME's arguments to the contrary elevate form over substance. The Bankruptcy Reform Act of 1994 added the requirement that administrative expense claims be "timely filed" or, if "tardily filed," be permitted only upon a showing of cause. 11 U.S.C. § 503(a) (as amended by Pub.L. No. 103–394 (enacted October 22, 1994)); *see* 3 Collier on Bankruptcy, *supra*, ¶ 503.01 at 503–4. An administrative claim filed without cause just minutes before a confirmation hearing is set to commence is untimely, particularly where, as here, the

---

14. Section 503(b) specifies that administrative expenses are allowed "after notice and a hearing."

15. In *Bittner*, the Third Circuit compared different methods of estimating the value of pre-petition stockholder claims pending against the debtor in a separate state court action. The method the stockholders proposed was for the court to estimate the present value of the probability that they would be successful in their state court action. 691 F.2d at 136. If the bankruptcy court determined that at present the case was not supported by 51% of the evidence but merely by 40%, the stockholders would be entitled to 40% of their claims. It was error, they claimed, for

the bankruptcy court to have assessed the ultimate merits and, believing the stockholders could not establish their case by a preponderance of the evidence, value their claims at zero. *Id.* The court of appeals disagreed. Evaluating the validity of the bankruptcy court's method in light of the goals of Chapter 11 favoring simple and efficient reorganization, it found no error in the assignment of a zero value to the stockholders' claims. *Id.* at 136–37.

16. A review of the docket in No. 95–D–1185 reveals the parties' Stipulated Plan and Schedule for Discovery was only approved by Judge Daniel on January 12, 1996.

lawsuit upon which the claim is based had been filed "months prior."

b. *Was the $0 valuation clearly erroneous?*

 CME asserted at oral argument that the bankruptcy court's $0 valuation was also clearly erroneous on its merits. The issue of whether a bankruptcy court used an appropriate method to estimate a claim is distinct from the issue of whether it reached valid findings of fact. *See Bittner*, 691 F.2d at 136 n. 2, 138. While the former is reviewed for abuse of discretion, the latter is subject to the "clearly erroneous" standard. *Id.*

Even assuming the truth of what was offered, the $0 valuation of CME's antitrust claims was not clearly erroneous. CME made no effort in its motion for allowance of administrative expenses or in its offer of proof to provide the court with any facts from which it could discern the likelihood of success on the merits of CME's claims in No. 95–D–1185, let alone estimate the amount of damages to which CME might be entitled if it did succeed. Other than to state it would prove $1.2 million in actual damages "at trial" (which then would be trebled under the antitrust laws) CME's offer failed entirely to tie ALS's alleged anticompetitive conduct with any specific harm or financial loss to CME. Taking every word of CME's offer as true, there simply was nothing on which the bankruptcy court could have based a value estimate.

D. *Confirmation*

Finally, CME asserts the ALS/ASC joint plan failed to meet the requirements for confirmation under 11 U.S.C. §§ 1129(a)(1), (2), (7), (9)(A) and (11) and 1129(b)(2)(B) such that confirmation of the plan was clearly erroneous. ALS counters that CME lacks standing to raise these issues on appeal, and denies there was any reversible error.

CME claims confirmation was erroneous because:

(1) The plan failed to satisfy § 1129(a)(1) because it limits the authority to object to claims to the reorganized debtor in violation of § 502(a);

(2) ALS and ASC failed to comply with § 1129(a)(2) by soliciting the wage claimants' acceptance in a "side deal" in violation of § 1125(b);

(3) The plan failed to satisfy the requirement under § 1129(a)(7) that impaired class claimants receive value under the plan "not less than" the amount they would receive under a liquidation of the debtor because (a) the liquidation analysis in ALS's disclosure statement "places no value on either ALS's PUC operating authority or ALS's claims against BHP" and (b) ALS and ASC offered no credible evidence respecting the value of ALS's assets at the confirmation hearing;

(4) Had the bankruptcy court evaluated CME's administrative claims properly, it would have found the plan unconfirmable under §§ 1129(a)(9)(A) and (a)(11) because there were inadequate funds to compensate creditors and reorganization was likely to be followed by the liquidation or the need for further reorganization of the debtor; and

(5) The plan failed to satisfy the "cram down" provisions of § 1129(B)(2)(B)(i) by requiring CME to accept a below-prime 8% interest rate on the payment of its $48 unsecured claim over 3 years.

1. *Standing*

 Any determination of standing involves a two-step inquiry: (1) whether a litigant has been sufficiently injured; and (2) whether he is the proper proponent of the rights he seeks to assert. In the bankruptcy context, the former is satisfied by establishing one is a "person aggrieved," i.e., one whose rights or interests is "directly and adversely affected pecuniarily" by an order of the bankruptcy court. *Holmes v. Silver Wings Aviation, Inc.*, 881 F.2d 939, 940 (10th Cir.1989) (quoting *Kane v. Johns–Manville Corp.*, 843 F.2d 636, 641 (2d Cir.1988)). Satisfaction of the latter depends on the nature of the claims of error. Even one "aggrieved" will lack standing to pursue claims based solely on the rights of third parties. *Kane* at 644 (no standing to assert rights of future claimants in attacking the plan).

 The ALS/ASC joint plan provides for a 100% payout of unsecured impaired

**340**

claims like the $48 claim held by CME. Nevertheless, CME contends its pecuniary interests are directly and adversely affected by the Confirmation Order because (1) payment is to be over a period of three years at rate of interest (8%) that is not fully compensatory; and (2) it would have received a 100% payout "faster and with less risk" under its competing plan. These contentions are dubious at best.

As an initial matter, ALS and ASC deny CME's claim is payable over time under the plan. They maintain it is a Class 4 consumer refund claim payable in full on the effective date of confirmation. *See* Second Am. Joint Plan (R.Vol. III Tab 220) at 4–6. In an unusual stance for a creditor, CME denies it can be paid in full on confirmation and insists its claim be treated as a Class 7 claim payable over a three year period. Even if this were true, the record supports the bankruptcy court's finding that 8% was "an appropriate present value rate" that provided CME with a value as of the effective date of the plan "equal to the allowed amount of its claims." *See* Confirmation Order (R.Vol. III Tab 237) at p. 4.[17]

I conclude CME's pecuniary interests are not adversely affected for the purposes of standing by a plan providing for a 100% payout of its $48 claim over three years at 8% interest. It follows, then, that CME's pecuniary interests are not adversely affected by the confirmation of the ALS/ASC joint plan over a competing plan calling for an immediate 100% payout of its claim. CME is not a "person aggrieved" under the *Kane* standard and therefore lacks standing to challenge the fact of confirmation on appeal.

Even assuming CME were "aggrieved" and that its claims were based on its own rights rather than those of third-parties, its assignments of error are insufficient to warrant reversal.

### 2. *Merits*

My conclusions above regarding CME's administrative claims, the adequacy of ALS's disclosure statement and the propriety of the 8% interest rate, dispose of CME's assertions of error in claims (3)–(5). I review the issues raised in CME's claims (1) and (2) under the clearly erroneous standard.

■■■ (1) *§ 1129(a)(1)*. Section 1129(a)(1) requires that proposed plans comply with all of the substantive provisions of Chapter 11. CME denies the section is limited to Chapter 11, and asserts a plan that limits creditors' ability to object to claims in derogation of § 502(a) fails to satisfy § 1129(a)(1).[18] Because § 502(a) is not a Chapter 11 provision, ALS and ASC maintain it falls outside the scope of § 1129(a)(1). In the alternative, ALS and ASC argue the failure of the plan to comply with § 502(a) was harmless because CME, a creditor receiving a 100% payout of its claim, is not a "party in interest" authorized under § 502(c) section to challenge others' claims. I agree.

As the committee notes immediately following § 1129 state, paragraph (a)(1) "requires that the plan comply with the applicable provisions of chapter 11, such as sections 1122 and 1123, governing classification and contents of plan." Senate Comm. on the Judiciary, S.Rep. No. 95–989, 95th Cong.2d Sess. 126 (1978), *reprinted in* Historical and Revision Notes, 11 U.S.C.A. § 1129 (West 1993). CME does not deny those provisions have been met. The bankruptcy court found the limitation on objection authority in the instant plan permissible given the lack of authority to the contrary and the fact the plan called for a 100% payout to CME. Confirmation Order (R.Vol. III Tab 237) at 4. The finding is not clearly erroneous.

17. The plan proponents' expert, Ed Trehan, testified that 8% interest rate provided under the plan to compensate unsecured Class 7 creditors for the lost time value of their money was reasonable. *See* Tr. October 11 Hearing (R.Vol. VII) at 263. He rejected the suggestion of CME's counsel on cross-examination that the creditors were entitled to at least the same rate ASC was paying its lender to finance the plan, i.e. prime (8.75%). The unsecured creditors, Trehan pointed out, were not banks. In his opinion, the appropriate rate was one the creditors could have been expected to earn on their own investments over the same period of time. The 8% rate, he concluded, was "at least 2 to 2½ percentage point higher" than the rate they could have expected investing the money on their own. *Id.*

18. Section 502(a) permits "a[ny] party in interest" to object to a claim for allowance.

(2) *§ 1129(a)(2)*. CME's allegations of a "side deal" between ALS/ASC and the Wage Claimants' Committee lack merit. CME argues ALS and ASC solicited the committee's approval "with other than an approved disclosure statement" in derogation of § 1125(b) when they "assured the Committee [they] will give them the benefit of the doubt regarding disputed claims." Opening Br. at 16. The bankruptcy court rejected CME's argument.

The assurances of which CME complains were part of the negotiation and solicitation process on an approved disclosure statement. "Once adequate information has been provided a creditor, § 1126(b) does not limit communication between creditors." *Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94, 101 (3d Cir.1988). The bankruptcy court's finding that the plan satisfied § 1129(a)(2) was not clearly erroneous.

## V. CONCLUSION

Based on all of the foregoing, I AFFIRM the bankruptcy court's Order of Confirmation dated October 24, 1995. The Order granting a stay pending appeal filed by this court on December 29, 1995 is VACATED and the appeal DISMISSED. The parties are to pay their own costs on appeal.